# In the United States Court of Federal Claims

No. 13-519 C

(Filed September 18, 2014)

```
* * * * * * * * * * * **    *
DIMARE FRESH, INC., et al.,   *
                             *
                             *    No Plausible Claims for Regulatory
            Plaintiffs,      *    Takings Arising from Warnings to
                             *    Consumers of a Possible Link between
      v.                     *    Tomatoes and Salmonella Outbreak.
                             *
THE UNITED STATES,           *
                             *
            Defendant.       *
                             *
* * * * * * * * * * * *      *
```

*M. Stephen Turner*, Tallahassee, FL, for plaintiffs.

*Eric E. Laufgraben*, United States Department of Justice, with whom were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Franklin E. White, Jr.*, Assistant Director, Washington, DC, for defendant. *Darieta M. Hawkins*, United States Department of Health and Human Services Office of General Counsel, Washington, DC, of counsel.



**OPINION**

**Bush**, *Senior Judge*.

Currently before the court is defendant's motion to dismiss the complaint brought under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC). The motion has been fully briefed, and oral argument was neither

requested by the parties nor deemed necessary by the court.  For the reasons stated below, defendant's motion is granted.

## BACKGROUND[1]

### I.      Warning the Public Not to Buy Certain Tomatoes

Plaintiffs are "growers, packers, and shippers of tomatoes in Florida and South Georgia."  Compl. at 2.  The Food and Drug Administration (FDA) responded to an outbreak of salmonella-related illnesses in June 2008.  *Id.* ¶¶ 8-15. Two warnings were issued to the public, on June 3 and June 7, 2008.  *Id.* ¶¶ 9-15. The warnings linked the salmonella outbreak to certain types of tomatoes.  *Id.* Plaintiffs in this case were substantially invested in the production, distribution and bulk sale of tomatoes at the time the FDA warnings linking salmonella and tomatoes were issued.  *Id.* ¶ 2.

The FDA also held a media briefing on June 13, 2008, again linking the salmonella outbreak to certain types of tomatoes.  Compl. ¶¶ 16-19.  All of these warnings had a burdensome effect on the market for plaintiffs' tomatoes.  *Id.* ¶ 21. Although any link between plaintiffs' tomatoes and the salmonella outbreak was eventually disproved and the FDA lifted its warning against tomatoes on July 17, 2008, all or almost all of the value of plaintiffs' perishable tomatoes was destroyed by the collapse in the market for tomatoes triggered by the FDA's warnings.  *Id.* ¶¶ 6, 20-21, 24, 30-32, 34, 37.  Plaintiffs characterize the FDA warnings as regulatory takings of their property.  *Id.* ¶¶ 1, 30-31, 35-40.

According to plaintiffs, the FDA "had no confirmation" of the link between their tomatoes and the salmonella outbreak and plaintiffs further allege that the FDA's analysis of the outbreak was flawed.  Compl. ¶¶ 22-23.  Plaintiffs aver that their tomatoes "presented no danger, defect or threat to consumers."  *Id.* ¶ 25. Plaintiffs also contend that the FDA delayed its revocation of the warnings against tomatoes for over a month "[d]espite accumulating evidence to the contrary."  *Id.*

---

[1] All references to the complaint are to the amended complaint filed April 16, 2014, unless otherwise noted.  The facts presented in the complaint are undisputed for the purpose of resolving defendant's motion to dismiss.  Def.'s Mot. at 2 n.1.  The court makes no findings of fact in this opinion.

¶ 22.

## II.    Excerpts from the FDA Warnings Issued on June 3 and June 7, 2008

Plaintiffs attached the FDA warnings to their complaint.  The warning issued on June 3, 2008 stated in relevant part that:

> The Food and Drug Administration is alerting consumers in New Mexico and Texas that a salmonellosis outbreak appears to be linked to consumption of certain types of raw red tomatoes and products containing raw red tomatoes. . . .
>
> The specific type and source of tomatoes are under investigation.  However, preliminary data suggest that raw red plum, red Roma, or round red tomatoes are the cause.  At this time, consumers in New Mexico and Texas should limit their tomato consumption to tomatoes that have not been implicated in the outbreak.  These include cherry tomatoes, grape tomatoes, tomatoes sold with the vine still attached, and tomatoes grown at home.
>
> . . . .
>
> In order to ensure that consumers can continue to enjoy tomatoes that are safe to eat, FDA is working diligently with the states, the Centers fo[r] Disease Control and Prevention, the Indian Health Service, and various food industry trade associations to quickly determine the source and type of the contaminated tomatoes.  As more information becomes available, FDA will update this warning.

Compl. Ex. 1.

The second warning, issued by the FDA on June 7, 2008, expanded the advisory against certain tomatoes to consumers nationwide.  In relevant part, this

warning stated that:

> The Food and Drug Administration is expanding its warning to consumers nationwide that a salmonellosis outbreak has been linked to consumption of certain raw red plum, red Roma, and red round tomatoes, and products containing these raw, red tomatoes.
>
> FDA recommends that consumers not eat raw red Roma, raw red plum, raw red round tomatoes, or products that contain these types of raw red tomatoes unless the tomatoes are from the sources listed below.  If unsure of where tomatoes are grown or harvested, consumers are encouraged to contact the store where the tomato purchase was made.  Consumers should continue to eat cherry tomatoes, grape tomatoes, and tomatoes sold with the vine still attached, or tomatoes grown at home.
>
> On June 5, using traceback and other distribution pattern information, FDA published a list of states, territories, and countries where tomatoes are grown and harvested which **have not been associated with this outbreak**.  This updated list includes:  Arkansas, California, Georgia, Hawaii, North Carolina, South Carolina, Tennessee, Texas, Belgium, Canada, Dominican Republic, Guatemala, Israel, Netherlands, and Puerto Rico. . . .
>
> FDA recommends that retailers, restaurateurs, and food service operators not offer for sale and service raw red Roma, raw red plum, and raw red round tomatoes unless they are from the sources listed above.  Cherry tomatoes, grape tomatoes, and tomatoes sold with the vine still attached, may continue to be offered from any source.

Compl. Ex. 2.

### III.   Excerpts from the FDA Media Briefing on June 13, 2008

Plaintiffs provide a twenty-six page transcript of the FDA media briefing held on June 13, 2008.  The court references here the portions of this transcript necessary for context.  The participants were welcomed to a briefing on the FDA's "salmonella in tomatoes investigation."  Compl. Ex. 3 at 1.  An FDA spokesman noted that "as . . . yet there is no specific geographic location identified" for the tomatoes that were the source of the salmonella outbreak.  *Id.* at 3.

Apparently Florida had been the subject of much speculation as a possible source for the salmonella, so an FDA official addressed the "complicated" issue of the safety of Florida tomatoes.  Compl. Ex. 3 at 3 ("I'm not wanting to put the focus on Florida specifically, but this is an opportunity for us to explain what the status of Florida is, because it is a little complicated.").  Parts of Florida were still suspected, but the northern part of Florida was apparently considered safe.  *Id.* at 4, 18.  As for other producing states, consumers were urged to consider tomatoes on the shelf that came from states deemed safe by the FDA to be safe for purchase and consumption.  *Id.* at 4-5.

When asked where most of the tomatoes consumed in the United States originated at the time of the salmonella outbreak, an FDA official stated that Mexico and Florida supplied most of those tomatoes.  Compl. Ex. 3 at 8.  The official also stated that he thought it unlikely that the salmonella had come from two different geographic locations, because of the identical genetic material found in the salmonella outbreak.  *Id.* at 9.  In addition, the official noted that there were no FDA investigators traveling to Mexico to investigate the outbreak.  *Id.* at 11.

The FDA made it clear that it had only issued a warning, not a recall, of tomatoes from states not yet listed as safe.  Compl. Ex. 3 at 12.  The legal consequences of a warning are that sellers of tomatoes are not required to pull their tomatoes from store shelves, even if these tomatoes originated from a state still under investigation as a possible source for the salmonella.  *Id.* at 13.  Instead, the focus of the FDA warnings was to educate consumers about which tomatoes were safe to eat and which were not safe to eat.  *Id.* at 12-13.

### IV.   Procedure

After plaintiffs' amended complaint was filed on April 16, 2014, defendant filed a motion to dismiss under RCFC 12(b)(6) on May 5, 2014.  Soon thereafter, plaintiffs filed a motion to join an additional plaintiff, which was granted by the court on May 27, 2014.  At defendant's request, however, the court ordered that the claims of this additional plaintiff be subject to the government's motion to dismiss.  Thus, defendant's motion to dismiss addresses all claims before the court in this case and is ripe for decision.

## DISCUSSION

### I.   Jurisdiction

The Tucker Act delineates this court's jurisdiction.  28 U.S.C. § 1491 (2012).  This statute "confers jurisdiction upon the Court of Federal Claims over the specified categories of actions brought against the United States." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) (citations omitted).  These include claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).

The court must determine, at the outset, whether plaintiffs' claims fall within the "specified categories of actions brought against the United States" that are within this court's jurisdiction. *Fisher*, 402 F.3d at 1172.  The Tucker Act concurrently "waives the Government's sovereign immunity for those actions." *Id.*  However, if jurisdiction for a cause of action is lacking this court must dismiss the suit.  RCFC 12(h)(3).  The court may, and should, raise the issue of its own jurisdiction *sua sponte* when it appears in doubt. *Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed. Cir. 1988) (citation omitted).

### II.   Standard of Review for a Motion Brought under RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).  When considering a motion to dismiss for failure to state a claim, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416

U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  The court must also inquire whether the complaint meets the plausibility standard described by the United States Supreme Court, *i.e.*, whether it adequately states a claim and provides a "showing [of] any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (citations omitted).

## III.   Analysis

### A.   Do Plaintiffs' Claims Sound in Tort?

A court's inquiry into the nature of a plaintiff's claim "does not end with the words of the complaint, however instructive they may be, for [the court] still must 'look to the true nature of the action in determining the existence or not of jurisdiction.'" *James v. Caldera*, 159 F.3d 573, 579 (Fed. Cir. 1998) (quoting *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994)).  Here, plaintiffs in their complaint avoid any mention of negligence, misrepresentation, or failure to observe a duty of care on the part of the FDA.  Nevertheless, plaintiffs characterize the actions of the FDA as lacking "confirmation that any tomatoes were involved in the illness outbreak," as evincing "a lack of understanding of industry distribution channels," and as "fail[ing] to correct the public warnings . . . for over a month."  Compl. ¶¶ 22-23.  Although plaintiffs describe their claims as demanding just compensation for a regulatory taking, a more obvious legal theory of recovery would have been to argue that the FDA negligently misrepresented the danger of consuming plaintiffs' tomatoes and that the United States is liable to plaintiffs as a result of the government's negligence.[2]

As the court discusses *infra*, plaintiffs have not cited to any cases where a consumer warning issued by a federal agency constituted a regulatory taking.  A much more typical analysis for such a factual scenario is whether an inaccurate consumer warning or some other release of inaccurate information triggered tort liability on the part of the government.  *See, e.g.*, *Mizokami v. United States*, 414 F.2d 1375, 1377-78 (Ct. Cl. 1969) (discussing potential tort liability for an

---

[2]/  In plaintiffs' original complaint, the growers candidly discussed the barriers to bringing a tort claim based on the FDA's warnings; the discretionary nature of the warnings renders the FDA "typically immune from tort liability."  Orig. Compl. ¶ 6.

inaccurate notice of contamination in spinach by reviewing cases where negligent misrepresentations on the part of the government had been alleged); *Banfi Prods. Corp. v. United States*, 40 Fed. Cl. 107, 139-42 (1997) (holding that the government's misstatement as to the danger of a contaminant in wine did not rise to the level of a negligent request to recall the wine); *Lance Indus. v. United States*, 3 Cl. Ct. 762, 775-76, 779-80 (1983) (holding that the government's dissemination of an inaccurate rumor regarding a pharmaceutical did not trigger liability for negligence); *see also H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1576 (Fed. Cir. 1984) ("[T]he negligent disclosure of information by the government, when the government had no *contractual* duty to supply such information may sound in tort.") (citation omitted).  Although a tort claim founded on the FDA's warnings at issue here would likely have been futile if brought in a district court for the reasons stated in plaintiffs' original complaint, *see supra* note 2, the facts alleged in the amended complaint appear to be have far greater resonance in tort jurisprudence than in takings cases.

The complaint could be read either to present claims sounding in tort, or to present claims which seek to extend the limits of takings jurisprudence.  The court will follow the parties' lead in reviewing the sufficiency of the takings claims presented in the complaint, but expresses some doubt at the outset as to its jurisdiction over claims that might more accurately be characterized as tort claims.  The court notes that it is well established that if plaintiffs' claims are truly tort claims this court has no jurisdiction over their suit.  28 U.S.C. § 1491(a)(1); *Somali Dev. Bank v. United States*, 508 F.2d 817, 820 (Ct. Cl. 1974).

### B.      Plaintiffs' Regulatory Takings Claims Are Not Plausible

Plaintiffs allege that the warnings issued by the FDA regarding a possible connection between their tomatoes and the salmonella outbreak "caused the loss of all or substantially all the value of Plaintiffs' property . . . [;] [t]his action appropriated a benefit to the Government and the public at the expense of the Tomato Farmers and Producers."  Compl. ¶ 37.  Thus, they argue that the "FDA's action constitutes a regulatory taking of the Plaintiffs' perishable tomatoes."  *Id.* ¶ 38.  Just compensation, based on the fact that "all economic value was lost due to the collapse of the market for [plaintiffs'] tomatoes," is allegedly due each of the plaintiffs under the authority of the Fifth Amendment of the United States Constitution.  *Id.* ¶¶ 30, 40.

8

Defendant argues that the effect of the FDA warnings on the market for plaintiffs' tomatoes does not constitute a regulatory taking.  The government relies on cases which have denied takings claims founded on pronouncements by the government which, although they may have caused financial consequences for the plaintiffs, lacked the requisite "legal effect" to rise to the level of a regulatory taking.  *See* Def.'s Mot. at 6 ("Courts routinely reject takings claims when, as in this case, the alleged Government action does not have any legal effect, notwithstanding any allegations concerning the practical, financial impact of the alleged action.") (citing cases).  Defendant's arguments are persuasive, and a brief recitation of the cited cases proves the point.

This court considered a similar claim when tobacco vending machine owners asserted a temporary regulatory taking arising from the notice and promulgation of pending FDA regulations banning most tobacco sales from vending machines.  *A-1 Cigarette Vending, Inc. v. United States*, 49 Fed. Cl. 345, 348-49 (2001), *aff'd sub nom. Brubaker Amusement Co. v. United States*, 304 F.3d 1349 (Fed. Cir. 2002).  In *A-1 Cigarette Vending*, letters and pamphlets informing businesses about impending tobacco vending machine regulations did not constitute regulatory takings because "[o]nly a Government regulatory act that actually restricts property may effectuate a taking."  *Id.* at 356 & n.15 (citations omitted).  When the United States Court of Appeals for the Federal Circuit considered these regulatory takings claims upon appeal, the Federal Circuit agreed with the lower court and held that tobacco vending machine regulations which had not yet gone into effect did not effect a taking of the plaintiffs' property rights in vending machine contracts.  *Brubaker*, 304 F.3d at 1358.  Thus, pronouncements and promulgated regulations which had not yet had any legal effect on the plaintiffs did not effect a regulatory taking of their property interests.

In another case somewhat analogous to the one at bar, the publicized intent of Air Force officials to take adjoining properties by eminent domain to enlarge an Air Force base, notwithstanding the consequences of these statements on the real estate market, was insufficient to effect a taking of any property rights of the landowner plaintiffs in *NBH Land Co. v. United States*, 576 F.2d 317, 319 (Ct. Cl. 1978).  In yet another case, a Federal Aviation Administration (FAA) "Determination of Hazard to Air Navigation," which determined that a proposed building near an airport runway would create a hazard, was not found to be a regulatory taking because the ruling was advisory and did not affect the property

owner's legal right to construct a building on its property. *Flowers Mill Assocs. v. United States*, 23 Cl. Ct. 182, 189-90 (1991). Both of these cases show that public statements by government officials are not sufficient, by themselves, to effect a regulatory taking, even if these statements profoundly affect the market for the plaintiffs' properties.

*Flowers Mill* is particularly instructive because of the advisory nature of the "Determination of Hazard" issued by the FAA. As the court noted, there might indeed be great economic impact on the property owner because of the publicized ruling of the FAA. *Flowers Mill*, 23 Cl. Ct. at 189. The court remarked, too, that the FAA's "Determination of Hazard" could "interfere with [the plaintiff's] distinct, investment-backed expectations." *Id.* Nonetheless, the court concluded that "the FAA action cannot be the basis of a Fifth Amendment taking because of the voluntary nature of the regulatory scheme." *Id.* (citation omitted). The summary of the holding in that case provides a concise rejection of regulatory takings claims which are founded on warnings provided to the public which are merely advisory in nature:

> Plaintiff's taking claim is based on the practical effect of the FAA [Determination of Hazard to Air Navigation]. While there may be practical consequences to an FAA finding of hazard which present obstacles to desired development (e.g., adverse impact on availability of financing and casualty insurance coverage), the FAA determination is advisory only and has no enforceable legal effect. For this reason it cannot be considered the type of governmental action necessary to sustain a Fifth Amendment taking claim. Accordingly, plaintiff has failed to state a claim upon which relief against the United States can be granted.

*Flowers Mill*, 23 Cl. Ct. at 183.

Thus, from these cases cited by the government a general principle or rule may be discerned. A regulatory takings claim is not plausible and cannot proceed when the government action at issue has no legal effect on the plaintiff's property interest. Advisory pronouncements, even those with significant financial impact

on the marketplace, are not enough to effect a taking of property under the Fifth Amendment.

Plaintiffs' attempts to disprove or escape this rule are unavailing.  First, plaintiffs state that the FDA's advisories regarding their tomatoes were "equivalent [in effect] to a hold on sales of the tomatoes until they perished."  Pls.' Resp. at 13 (citing *Yancey v. United States*, 915 F.2d 1534, 1539-43 (Fed. Cir. 1991)).  The court cannot agree.  There was no ban on the sale of plaintiffs' tomatoes equivalent to the quarantine of poultry at issue in *Yancey*.  There is an obvious distinction between an advisory announcement which affects market sales and a quarantine which prohibits sales.  Plaintiffs have failed to allege any plausible legal effect on their property interests occasioned by the FDA advisories.

Second, plaintiffs attempt to distinguish the FDA's advisory function regarding food safety from the cases cited by defendant which involved advisories or statements issued by the government that had no legal effect.  Plaintiffs allege, for example, that the FDA "had the power to seize the tomatoes or enjoin their sale, or bring criminal proceedings, and presumably would use this power if its warnings were not respected."  Pls.' Resp. at 18 n.5.  The complaint does not allege, however, that the FDA exercised any of these powers to effect the taking of plaintiffs' tomatoes.  Only the FDA advisories are blamed for the taking of plaintiffs' property interests.  Compl. ¶¶ 32, 37.  These FDA advisories fall within the rule of government actions that have no legal effect on property interests and that do not constitute regulatory takings.

Third, plaintiffs argue that it is not necessarily legal effect, but practical consequences that can create a taking.  *See* Pl.'s Resp. at 14 ("The proper focus is on practical cause and effect.  If government action is 'functionally equivalent' to a physical seizure, it can be a taking.") (citation omitted).  In plaintiffs' view, "[g]overnment action that intends to and foreseeably does cause loss of property value can be a taking even if not legally coercive."  *Id.* (citations omitted).  Furthermore, according to plaintiffs, the FDA advisories were coercive, at least to some degree:

> The FDA's actions obviously had a coercive effect on
> the market, even if not coercive against any third person
> in particular.  While the government warning continued

11

in effect, no one would risk buying such tomatoes for
resale to the public. . . .  Even if the government's action
is viewed as instigating a boycott by potential buyers, the
intended and direct result (a market shutdown) was
tantamount to coercion, as [the] FDA knew that no one
would assume the risk of buying or selling food under its
warning.

*Id.* at 14 n.3.

Unfortunately for plaintiffs, their attempt to eviscerate the rule that must be
discerned in *Brubaker*, *NBH Land*, *A-1 Cigarette Vending* and *Flowers Mill* is
unsupported by relevant authority.  The cases cited by defendant specifically
demonstrate that public statements and advisories by the government are not
regulatory takings if they have no legal effect on property interests.  None of
plaintiffs' cited cases address this issue, and plaintiffs' attempts to distinguish
defendant's cases, Pls.' Resp. at 16-18, are not persuasive.

Finally, the court must agree with defendant that plaintiffs' regulatory
takings claims would require "independent actions of consumers [and retailers
declining to buy plaintiffs' tomatoes] to be attributed to the Government."  Def.'s
Reply at 13.  The court is aware of no caselaw which would support such a theory
of recovery.  Although a wide range of government actions may give rise to
regulatory takings, plaintiffs have not cited any cases which hold that press
releases and consumer advisories, by themselves, can constitute regulatory
takings.  Plaintiffs' regulatory takings claims must be dismissed for failure to state
a claim upon which relief may be granted.

## CONCLUSION

Accordingly, it is hereby **ORDERED** that:

(1)    Defendant's Motion to Dismiss, filed May 5, 2014, is **GRANTED**;

(2)    The Clerk's Office is directed to **ENTER** final judgment in favor of
       defendant, **DISMISSING** the complaint with prejudice; and

(3)    No costs.


                              /s/ Lynn J. Bush
                              LYNN J. BUSH
                              Senior Judge